Good morning, I'm here to please the court. My name is Mark Picker. I represent the appellant, John Oliver Snow. This is a case, this is a civil rights prisoner case regarding medical treatment at the Ely State Prison. The question, this is an appeal from a summary judgment decision by the district court. It is our contention that the district court erred in granting summary judgment because it put its own determination of facts in place of the law. What it did was, in this case, the court, the district court, took the magistrate court's, the magistrate judge's order, which determined that there were questions, that there were genuine dispute of material fact, genuine issues of material fact in this case, and then took those decisions and skewed them somewhat. In fact, to use the word specifically, I heard the court talking about, specifically what the district court did was it added on to certain conclusions by making factual determinations of disputed facts. It basically decided disputed facts and put itself in place of the trier of facts, which would have been the proper thing in this case. Like what? Like what fact did it find that was, you know, material and disputed? The first one that I would offer to you, Your Honor, is the one where the judge said that there was a specific order, I believe it was by Dr. Long, that said surgery is necessary and is absolutely needed, but then added, the court added a phrase on to the end of it saying, but he didn't say it was needed immediately. No one ever asked that question, and there was no evidence that that was a disputed piece of evidence as to whether the decision should, whether the surgery should have happened sooner than later. In fact, the court also put itself into the decision-making process, the factual process, in deciding that it was reasonable to do long-term medication as opposed to surgery. The interesting thing, of course, in that is, is that all of the doctors put themselves in a place where they said, yes, medication is fine short-term while you're getting ready for surgery, but no surgery was ever scheduled. It was only scheduled after this lawsuit was brought. So that's one place. Those are two places that the district court put itself into. In addition, what the district court did was it inserted itself into the decision-making to decide that the utilization review panel is justified in finding a difference of opinion. Now, the problem is, is that the different, that the URP finds a difference of opinion not based on medical fact. They find it based entirely, well, actually, we're not even sure why they find it because if you recall from the record, the URP doesn't give bases for why they turn this down. Now, we have four doctors who at one time or another have all either ordered or said the surgery was necessary, and, in fact, one doctor said the surgery was urgent and was almost on an emergency basis. Based on all of that, the URP doesn't take that into account. The URP does not contain any of the examining physicians. It's a removed body, and it decides that the surgery, that they're not going to grant the surgery for whatever reason. The problem is, is that the district court then says, okay, that's fine with me. As long as the URP says surgery is not necessary, then that's fine. The problem with that is, is that that is quite literally putting itself into the fact-finding process, the fact-making or the fact-deciding process. As the amicus argued and as we argued in our opening brief, it is hard now, if this is the standard that the district court is going to be allowed to hold up, then probably no medical case for a prisoner within the Nevada Department of Corrections would ever survive summary judgment, because if the URP is just given carte blanche to say no and without a basis, then that's okay. So that's the ignoring of the precedent for determining summary judgment and the fact-finding process, both in these ways really fly in this Court's precedent of how to decide these kind of cases. And specific, the Gibson case is almost a blueprint from this circuit as to deciding these kind of injury cases, these kind of medical cases. Yet the district court ignored that. And in fact, also, the district court decided to leave out a number of the facts that were disputed but that the magistrate court, magistrate judge, quoted saying, okay, there's this fact over here and there's this fact over here, so that means there's a dispute of fact. These are material facts. And the district court, as I said, ignored that. And yet the district court literally didn't even mention some of those facts in determining that that was the way it would decide this case. It -- Counsel, what's the situation currently? For Mr. Snow? Yes. Whether it's in or out of the record. Mr. Snow is currently housed not at the Ely State Prison. He is currently housed at the Nevada State Prison. He is kept in protective custody there, actually pending the outcome of this case. He was supposed to get medical treatment. He has not yet had any surgery scheduled. He has not yet had any hip surgery done. He did receive a stent because he had a heart attack last November. That was found, basically his heart problem was found because he had a heart attack. Although there was some argument in the request to supplement the record, which I know that you've, that motion is still pending before Your Honors, there was a question about, well, we found it. Well, they didn't find it. They've been, he should have been scheduled for surgery four, three years previous to that, so four years ago now. And if they had done that and done the preoperative examination then, they would have found a heart problem that they could have solved, likely to have solved without having to do surgery. He'd have had the hip replacement surgery. None of us would be here. None of that happened. So the government or the state is arguing that, well, you know, he had this heart attack, so now we were justified. Well, that's, you know, that's an interesting argument that I don't think I need to address too much. But the point being that he only, they only discovered the severity of his heart problem when he had a heart attack and fell on the ground in his cell. Currently, and in fact, he is doing well enough other than the fact that he does not walk. He cannot exercise. He, at best, needs help to get off his bunk. He is able to shuffle or scoot himself to his cell door. And he is receiving some pain medication. Since the state's position in this case was that he was not helping himself because he was refusing pain medication, he has taken it upon himself to refuse no pain medication. If they give him, if they ask him to take something, he takes it. Although, as Your Honors can see from the record, there is a question of whether some of these medications cross-treat him and have caused severe kidney damage. Now, is there an effort now to schedule surgery, or what's that all about? There are two efforts here, Your Honor, or actually three efforts. One is to get surgery scheduled because he is in severe pain. The second certainly is to reform through the injunction process, to reform the medical process within the Nevada Department of Corrections, which, as you can see, the ACLU has filed a lawsuit on and settled with the Nevada Department of Corrections as to one prison, so that they are monitoring the treatment in that one prison. And then the third issue is Mr. Snow seeks some pain and suffering because this should not have lasted as long as it has. He's been put through excruciating pain. We started this process, and he was ambulatory without aid. And, in fact, that's noted in the medical records is that the doctors were amazed that with the amount of pain he must be in given his circumstances, that he could be ambulatory without aid. He is no longer ambulatory even with aid. I mean, he's barely able to get around. Could he be ambulatory again with the operation? Yes. Now, again, this isn't in the record, but they said he could not have the operation for at least a year after sometime last November. Correct. So we're almost up to the year. And to date, no preoperative sessions have been ordered. No surgery has been scheduled. So even though they say that they need it a year, it's not in the record, as Justice Fletcher asked me about, but it's still outside of the record. Nothing has yet been scheduled. Well, now, is part of your case to get an injunction to require that it be scheduled? At the very least, Your Honor, what we'd like is an injunction to get them to start the preoperative process. Because certainly if he is not a medical candidate, even now, for that surgery, we would not expect surgery to happen. But, quite frankly, four years ago, he was certainly a good candidate for it. Now he may not be, but we don't know that because there's no effort made to find out. By preoperative process, is that what you mean? I'm sorry, Your Honor? By preoperative process, do you mean to find out whether he is a candidate? Yes. That would be at the very least, which it's happened and it has not. Do you want to say anything else? I will serve the rest. Thank you. Good morning, Your Honor. May it please the Court, my name is Clark Leslie. I'm a Senior Deputy Attorney General for the State of Nevada. Your Honor, I was surprised, and I will always accept a gift when I am offered one. In this case, my esteemed and honorable opponent mentioned that had a proper workup been done four years ago, they would have discovered the heart problem and then would have been able to have the surgery for the total hip arthroplasty thereafter. That isn't in the record, and it's got to be pure speculation. I agree, Your Honor. And that was exactly going to be my point, that we don't know. But what I was going to state is these are the very doctors that the plaintiff is relying upon to tell you that he needs the arthroplasty. These same doctors who never performed any of the procedures necessary to determine his suitability for the surgery. Now, in fact, the Utilization Review Panel consists of board-certified physicians. There are six of them, either in family practice or in other areas and disciplines of medicine, who felt it was not appropriate at that time and that they wanted to have a conservative course of treatment instead. Twenty years ago, and I can state this, I believe, with some confidence, and I think it will resonate with this Court, the Ninth Circuit has held that mere negligence for gross negligence or even delays will not constitute a case for deliberate indifference under the Eighth Amendment. Well, delays can. They can, Your Honor, if there is a harmful effect as a result of that. And I was thinking of the cases that Judge Reinhart was involved with, the Wood versus the Wood case and the McGuckin case, one where you, Judge, were the majority opinion writer and the other where you were in dissent. But the point is that in the Ninth Circuit, and I think in most cases, there is a necessity of showing Wolfland-Walton conduct. And I'm going to keep bringing it up. In this case, which it seems that the weight of the surgeons and the doctors' decisions was, yes, he had this deteriorating condition in his hip, and he ought to have surgery and get a replacement hip. And I'm going to keep bringing it up.  was, yes, he had this deteriorating condition in his hip, and he ought to have surgery and get a replacement hip. An opinion that was rendered by two doctors who had seen him either only once or twice in the course of three years and who admittedly did not have the chart. Well, no one denies that he doesn't have a deteriorating hip condition, however you want to describe it. That's correct, Your Honor. We concede that the first prong of the Estelle Farmer test does exist here, that there is a serious medical need. But we are dealing with an individual who is 68 years old and who suffers from the same kind of problems that anyone of that age would in addition to the overlying existence of an arthritic condition. Well, now, what age is he now? Sixty-nine years old. But at the time that these things were happening, he was, what, 64, 65? Yes, Your Honor. That doesn't seem too old for some of us. Since that's roughly my age, I would agree with you, Your Honor. But my point would also be that at that time, the doctors that have rendered the opinion that is the linchpin of the plaintiff's case really didn't have very much information before them when they made the decision that this surgery was going to be necessary. But more importantly, Your Honor, they didn't put a time limit on it. When they came back and they saw John Snow later and they saw that he had not yet had the surgery, they weren't shocked. They weren't upset. They weren't pounding the table saying, this man. But Snow was in great pain. So what do we care about whether the other people were not shocked? We care a great deal about that. And I think the record shows that my client expressed that kind of concern. And I don't want to argue the fact that there may be some question about the degree to which he was in pain because the very doctor that recommended the surgery said that on a scale of 1 to 10, his pain threshold was a 4. Number two, we went to great lengths to document in our brief there were periods of time when the medications had a very good effect that John Snow refused to have a movement from an upper to a lower tier where he could have avoided scares and other things which would suggest a different state of health and pain than what is being offered now. But no question, he is experiencing some discomfort. But the question is whether or not... Have you ever yourself had pain from a deteriorating hip? I have bilateral degenerative discs in my lumbar spine. I have. I do. And it's very uncomfortable. Yes. It's more than uncomfortable. I would agree, Your Honor. And the question is what do we do with that? And in the context of an inmate who is experiencing these kind of problems, the issue was whether or not there was willful and wanton conduct on the part of the medical care providers in the course of treatment that they elected to engage in. This is not an individual that was allowed to languish in a cell who went for weeks or months without doctors treating him. On the contrary, he had extraordinary medical care. It's just not the kind of care that he or his attorney think are appropriate. He received a great deal of pain medication and anti-inflammatory medication that the record itself, and Mr. Snow himself admitted at times had a salubrious effect. Now, what effect did these medications have on other conditions like on his kidneys? That is an issue that constitutes what we would think is the only possible area of relief that Mr. Snow can look at. And that's the question of whether or not the medical, the alternative medical treatment was unreasonable. And it could be deemed unreasonable if it caused an adverse effect or an injury to the inmate. Your question was what problems did it create? The answer is none. And more importantly, the question came up because my client was so serious in its efforts to constantly monitor the care of Mr. Snow that when they picked up a spike in the creatinine levels of his renal system, they sent him to the regional medical facility for the precise purpose of determining whether or not the pain medications were creating a problem with his liver and his kidneys. And after a great deal of testing and monitoring, they determined there were no injuries or problems or deleterious effects to his liver or kidneys. So while there was a suspicion, it turned out to be a suspicion without basis. But more importantly, how did they even find that? It was because they cared enough about this patient to constantly monitor him to make sure that the medications they were giving him were not hurting him. And so in the context of inmate litigation and medical treatment, when we come back to the question that my honorable opponent wants to avoid, but I'm going to keep asking this Court to come back to, where is the willful and wanton misconduct? Perhaps my client can be criticized for its decisions. Perhaps things didn't work out as they should have. But that's another question for another time. But the question here is, was it willful and wanton? They treated him on over 50 occasions. He was receiving daily treatment from some members of the staff. He received treatment that did alleviate his pain on many occasions, as is documented in the record. This is not a case of deliberate indifference. And with respect, we believe that this Court would have to redefine that term in order to find liability on the part of my client. Tell me, what's the status of his legal case? He's on death row? Yes, Your Honor. And I believe that his most recent effort was not successful in terms of getting his case overturned. And I spoke with our habeas staff, and I believe that his efforts in that regard were not successful. And I would take some issue with the manner in which the ---- Does he have an execution date? No, Your Honor. I didn't hear that last question. Does he have an execution date? In Nevada, we currently have a moratorium. We're trying to work out the three drug cocktail and other issues. So there are no scheduled execution dates for any prisoners in Nevada, to my knowledge. And I believe that's true. Again, I pointed out to the Court, and then I will rest unless the Court has any questions. This is not a classic case of deliberate indifference in the sense that he was allowed to languish and be ignored. On the contrary, the copious medical records indicate exactly the opposite. Mr. Snow could prevail if he showed that there was unreasonable medical care that was provided. And that is the argument that is being promoted rather heavily by Mr. Snow in his very capable counsel. But we would point out to this Court that when you look at the cases that define what unreasonable medical treatment is in the context of prisoner medical care, we find a huge gulf between what that term means in the law and what happened here in this case. Mr. Picker cites the Jackson case for the proposition that unreasonable medical care can constitute deliberate indifference, even where the treatment is given. But when you look at the cases within that decision that are used for that purpose, we find exactly the opposite of what we have here. In the Williams case, for example, an inmate was involved in a fight on the prison yard and had a portion of his ear cut off. And the inmate grabbed the ear. He was taken to the prison infirmary. And the doctor literally held up the ear and said, You're not going to need this anymore. And in the presence of the inmate, he threw the ear away when he sewed him up. In the Thomas case, an inmate presented himself with a serious infection. The physician knew. He knew that this inmate had an allergy or an allergic problem with penicillin. And yet he intentionally provided penicillin to him with a horrible result and an adverse reaction. And then finally, in the Martinez case, there was a doctor who did not prescribe pain medications when performing a rather serious surgery. And then the orders of a secondary doctor to not have this inmate stand on his leg or bear weight was ignored. And he was forced to walk and to use that leg, which undid the effects or the attempts of the surgery. Those cases do not parallel what we have here, not by any stretch of the imagination. And we would submit that without a showing of unreasonable medical care, the decision of Judge Jones was correct and should be upheld. And, Your Honor, we would state to this Court that it was specifically determined that there had to be at least a one-year wait before any further determination could be made. That will occur on November the 22nd. You mean that's the end of the one year? Yes. So we're about five weeks away. We would point out that he received care from one of Northern Nevada's finest board-certified cardiac surgeons in the process, and this was done as a result of the workup and not necessarily because of a collapse on the part of Mr. Snow. But once again, it's an instance where my client, I think, has done everything that is required and then some for the care and treatment. Well, that was after the lawsuit was filed, right? It is correct, yes, Your Honor, that the lawsuit was filed and then ultimately the decision was made to grant and authorize the surgery. But we're talking about six board-certified physicians who agreed that it was not appropriate to proceed with the surgery at that time. And as we point out at page 16 of our brief or at page 64 of the excerpts of record Is there any explanation of why? Oh, you mean why they didn't authorize it right away? Yes, why they decided not to proceed with surgery. There is nothing in the record where the doctors specifically state that, but they wanted to engage in a conservative course of care before they made the next decision. This is a very serious, dangerous, invasive surgery that takes six to seven hours. And before that kind of risk was taken, they were perhaps hoping that something would come up that would not require the surgery. Well, you know, hip replacements are all just routine today. So I've heard. I've also heard the phrase that it's routine only if it's happening to someone else and not to you or me. But yes, they are having very good results from hip replacements. Let me ask this. Do you want this case to go to mediation? I would not object to that at all, Your Honor. Has this been attempted already? Not since I've been involved and to my knowledge, no. Thank you. Thank you, Your Honors. Could I, could I, let me ask a question. You have a, you still have a pending motion to supplement the record, right? We do, Your Honor. Anything you want to add to that motion? Just that I think in order for this Court to have a, and thank you, Your Honor, for reminding me of that. In order for this Court to have a complete and accurate record of what's happening currently, it will be necessary to supplement the record so the Court can have a full flavor of the current status of the matter. In fact, some of the things you refer to in your argument rely on the supplement. I mean, are nowhere in the record except in the supplement, right? That's correct, Your Honor. Thank you. Thank you. Let's start with Judge Fletcher's question. The mediation question? Yes. Mediation has been attempted three times, Your Honor. It has been unsuccessful, including with this Court. The State refused mediation in this Court with your mediation program. Well, if the State were not willing to mediate. It's news to me today. We've always said we were. No, the question was, is, if the State is willing to mediate, do you have any objection? No. We have always, we have always been in favor of that, Your Honor. It does seem that it would be nice if this kind of a case could be resolved. It would be nice to resolve this case. I totally agree, Your Honor. I will address head-on the State's argument, the appellee's argument, that I'm dancing around willful and wanton misconduct. Let me attack that one straight on and make it very simple. The State is arguing that the doctors who ordered surgery had only seen Mr. Snow one or two times. The URP, the Utilization Review Panel, none of those doctors ever saw Mr. Snow. They made a decision based entirely on factors that had nothing to do with his medical condition. That, they give no reason for it. How do we know what they based the decision on? Well, in part, we can use the State's own argument from just a minute ago, which was they hoped something would come up so it would have, it would, they wouldn't have to perform surgery. I think this goes back to Justice Fletcher's question about what is, what Mr. Snow's legal status is on death row. And what we offered as testimony in various situations, the statements that, let's see, Dr. MacArthur's statement, this guy's an asshole, I'm not going to treat him. The, Max Carter, the nurse's assistant, saying, nope, going to let you suffer. There's, there's, it's very, and the, and the testimony by, under oath by Nurse Wilkins, who said that it had come down from the director that people on death row were not to get any extraordinary medical care. I mean, after all, they're going to die or they're going to be executed, why should we spend money on them? So I think there's your willful and wanton, dead on, straight ahead, I don't want to dance. Second of all, it also addresses the URP and their decision, something, they were hoping something else would come up. Well, sure they were, to address also Justice Fletcher's question. Mr. Snow's latest state petition for habeas corpus was denied at the Nevada Supreme Court level, but that was taken back to state court on an abeyance and remand level from the federal court, the U.S. District Court in Nevada still has his case active, his federal habeas court case, and he is being represented by a federal public defender on that case. The state argues that they provided extraordinary care, and that's really kind of the crux of the issue in this case, is that the district court put itself in that position. It decided that was appropriate care, yet we have doctors, we have evidence, we have testimony that it wasn't appropriate care. Now, just to quote from this Court's decision in Hunt v. Dental Department, the evidence has to be viewed in the light most favorable to the nonmoving party, and that if it was, it could support a finding of deliberate indifference to Hunt's serious dental needs. Interesting, I mean, we're not dealing with life-threatening injuries here, we're dealing with dental needs. And that's the situation what we have is between that and the Gibson decision, where the court again noted that all reasonable inferences must be given to the nonmoving party. Let's go back to why we're here. The district court didn't do that. The district court ignored that and put itself in the fact-finding position instead, and that's why we're here. And we'll ask that you reverse that. Thank you. Thank you, counsel. Let me ask one question. Do you oppose this motion to supplement the record? Yes, we did, Your Honor. And we did it based on the fact that that information was all available prior to the motion for summary judgment and was never put before the court, the district court, so it would have been appropriate to have done it there. They knew about it well beforehand. And, in fact, to answer the part of your question that you asked earlier, and I don't mean to go too far past time, but Mr. Snow's cardiac history predates this case. There is questions in there about whether he has cardiac problems. It didn't just come up because they were so concerned. It came up because Mr. Snow kept raising it. Thank you, counsel. Thank you. The case to be argued will be submitted. The final case of the morning is Schwartz v. Ryan. Thank you.
judges: Fletcher, Reinhardt, Tashima